(Decided April 8th, 1897).

---

## EMANUEL H. MILLER AND ARTHUR E. WILSON vs. ERNEST GITTINGS.

*Injunction Restraining Prosecution of Suit in Another State by one Citizen of this State Against Another—Gaming Contract—Jurisdiction of Equity.*

The prosecution of a suit instituted in another State by a citizen of this State against another citizen of this State will be enjoined when the foreign forum was selected for the purpose of depriving the defendant of benefits secured to him by the law of this State and of obtaining an unfair advantage.

The Courts of Equity of this State have jurisdiction to compel the citizens of this State to respect its laws even beyond its territorial limits, and will restrain its citizens from prosecuting suits in other States, instituted there for the purpose of evading the law of this State.

A bill of complaint set forth that there were certain gambling transactions in stocks between the plaintiff, a stock broker, and the defendants, by which plaintiff became indebted to the defendants; that the validity of these transactions, which took place in this State, was to be determined by the law of this State and by that law were void; that the defendants for the purpose of evading this law and of obtaining an oppressive and inequitable advantage, and also for the purpose of evading the provision of the Constitution of this State forbidding imprisonment for debt, instituted a suit, upon false statements of

fact, against the plaintiff in New York, under which plaintiff was there arrested and held to bail. *Held,* that if these allegations be sustained the prosecution of the suit in New York should be restrained.

In such case the fact that one of the parties against whom the suit was instituted in New York was a resident of that State and a partner of the other defendant, who resided in this State, does not deprive the Court of jurisdiction to restrain the action. *

Appeal from an *ex parte* order of Circuit Court No. 2, of Baltimore City (HARLAN, C. J.), granting the injunction asked for by the bill of the appellee.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, BOYD and RUSSUM, JJ.

*John Prentiss Poe* and *Benjamin Rosenheim,* for the appellant.

The general proposition is not denied, that citizens of a State may in a proper case be enjoined from bringing suits or proceeding with suits already brought in another State, when such suits are merely for the purpose of evading the laws of their own State. "The jurisdiction is established by the clear weight of authority as well as by the necessity of interposition under special circumstances, where the foreign suits appear to be ill-calculated to answer the ends of justice." *Pickett* v. *Fergum,* 45 Ark. 177.

The present case, however, does not fall within any of these principles. 1st. The suits in New York were not brought by the appellants in order to evade the laws of Maryland, their own State. If the $8,000 check was given in payment of a gambling transaction, recovery cannot be had upon it in New York. Such a defence is as valid there as in Maryland. The suit brought for a conversion of the

---

* Cases relating to injunctions against suits in foreign jurisdictions, in addition to those cited in the opinion of the Court and arguments of counsel in this case, will be found in *Cole* v. *Cunningham,* 133 U. S. 107, and note appended to *Thorndike* v. *Thorndike,* 21 Lawyers' Reports Annotated, 71.

bonds and stocks would have been maintainable here, if the appellants had seen fit to bring it here. They elected to bring it in New York where Allen lived, which, we submit, they had a valid right to do, rather than in Baltimore where Gittings lived. They did this advisedly, because a judgment against Allen was of more value than a judgment against Gittings, as appears from Gittings' letter to Allen, dated September 10, 1896. Gittings complains because he was arrested in New York. In reply, we say that no policy or laws of the State of Maryland were infringed thereby. He was arrested because the appellants claimed he had wrongfully converted to his own use or that of his firm their personal property. *This conversion took place in New York, where, by the law, the guilty party was subject to arrest.* Gittings surely cannot be heard to complain, because, after committing a wrong punished by the laws of the place where the same is committed, he is made to suffer the penalty prescribed therefor, even though at the instance of citizens of another State. Surely, when a man commits an act in a State where the same is made a crime by law, even though the same act may not be a crime according to the laws of his domicile, he is responsible for the legal consequence of the act, to the person or persons whom he has wronged. Nor is this an attempt to imprison a man for debt. Gittings was arrested for the wrongful conversion of the appellants' personal property, which act, under the laws of the State where the same took place, made him liable to arrest therefor.

2d. There are no special circumstances that justify, nor do the ends of justice justify, the injunction. Gittings does not offer to pay what he owes the appellant, nor does he aver that he will return their stock, which his letter to Allen of September 10, 1896, proves that he had wrongfully hypothecated. He has simply obtained process of a Court of Equity to defeat a legitimate attempt on the part of the defrauded creditors to collect a clear indebtedness, without showing any special circumstances to warrant it, and without one iota of equity to justify it. On the other hand, great injus-

tice is done to the appellants.   By the injunction they are
not only prevented from going ahead in New York with
their suit against Gittings, but are actually enjoined from
proceeding against Allen, the responsible defendant, in New
York, where he resides.   We maintain that this case goes
further than any of the authorities justify.   In *Keyser* v.
*Rice*, 47 Md. 203, as in practically all the other cases
supporting the doctrine therein announced, the Court inter-
fered to prevent a citizen of this State from proceeding with
an attachment in another State, which attachment though
legal in the State where issued, was in violation of the law
of the attaching creditor's own State.   The foreign Court
had never acquired jurisdiction of the party moving for the
injunction.   *Cole* v. *Cunningham*, 133 U. S.; *Am. & Eng.
Enc. of Law*, vol. 10, pages 910, 911; *Beach on Injunction*,
sec. 412.

In this case, the New York Court had not only acquired
jurisdiction over Gittings, but he had actually pleaded to
the suit brought against him and had by his counsel, in
addition, moved for an order vacating the order for his
arrest, which motion had been overruled.   We contend that
having submitted to the jurisdiction of the New York Court,
and having pleaded defences to the actions brought against
him, he should not be allowed now to successfully ask that
the proceedings against him be enjoined without showing
the strongest kind of equities in his favor.   These his bill
clearly does not show.

He who comes into a Court of Equity must come in with
clean hands.   His bill makes no offer of restitution by him
to the injured defendants; taken in connection with its
exhibits, it fails to show that the appellants were endeavor-
ing by the suits instituted by them in New York City to
evade the laws of the State of Maryland, the place of their
domicile.   It does not show, however, that the suits at-
tempted to be restrained were brought in the place where
the more responsible defendant resided, and where one of
the acts that occasioned one of the suits was committed, and

that, therefore, the suits had been properly and rightfully instituted, and that by restraining the further prosecution of them, great injustice will result to the parties restrained.

Gittings had also a full, adequate and complete remedy at law, and therefore equity should not intervene. Gittings' bill was not brought to prevent a threatened arrest, but was filed after he had been arrested and after he had secured his liberty by giving bail. No wrong or injury can be done to him now if the suit in New York is allowed to proceed. If he be innocent of the wrongful conversion of the stocks and bonds, such innocence when proved will be as complete a defence in New York as here in Maryland. The mere inconvenience of going to New York to defend the action is not sufficient ground to enjoin the further prosecution of the action there. *Beach on Injunction*, sec. 75. *Donnelly* v. *Morris*, 59 N. Y. Super. 557.

In addition to all this, the proceeding in New York in which Gittings was arrested is in the nature of a *quasi* criminal proceeding under the laws of that State, and therefore not subject to be interfered with by an injunction issuing from a Court of Equity. Courts of Equity have no jurisdiction over criminal matters, whether the prosecution or arrest sought to be restrained arises under statutes of the State or under municipal ordinances, or under the common law. *Beach on Injunction*, sec. 59. *Davis* v. *American Soc., etc.*, 75 N. Y. 362.

*Frank Gosnell* and *William S. Bryan, Jr.* (with whom was *Edward N. Rich* on the brief), for the appellee.

The power of a Court of Equity in a proper case to compel persons within its jurisdiction to do, or refrain from doing, acts beyond its jurisdiction, has been clearly recognized as the law since the decision of the case of *Penn* v. *Lord Baltimore*, 1 Vesey, Senior, 444. That the Court will, acting under this principle, restrain one of the citizens of its own State from attempting to gain, by suit in another State, an advantage over any other of the citizens of its own State,

which is contrary to equity or good conscience, especially
where the prosecution of such suit in the foreign jurisdic-
tion would be an evasion of the settled policy of the State
and would defeat the operation of its laws, and deprive one
of its citizens of the immunities and protection which those
laws furnish him, seems to be clear.   2 *Beach on Modern
Equity Jurisprudence*, sec. 649.   So far as our researches
have extended, this principle seems to be supported by an
overwhelming weight of authority.   Possibly nowhere has
this principle been more clearly recognized than in *Keyser* v.
*Rice*, 47 Md. 203, where this Court declared the power of
the State to compel its own citizens to respect its laws, even
beyond its own territorial limits, to be supported by the
great preponderance of precedent and authority ; and this
Court there sustained an injunction to restrain the further
prosecution in West Virginia of an attachment by which the
defendant sought to recover wages due the complainant in
Maryland and here exempt from attachment.

In *Dinsmore* v. *Neresheimer*, 32 Hun. 204, the Supreme
Court of New York held that an express company could
maintain an action in New York to restrain the defendant, a
resident of New York, from prosecuting actions against the
company in the District of Columbia brought to avoid a
*decision* of the Court of Appeals of New York differing from
the rule upon the same subject in the District of Columbia.
[Here it is not merely the effect of a decision of a Court
which the appellants are seeking to evade, but an express
clause of the Constitution of the State].

In *Wilson* v. *Joseph*, 107 Indiana, 490, the Supreme Court
of Indiana ruled that an injunction would lie to restrain a
resident of Indiana from prosecuting an attachment pro-
ceeding against another resident in the Courts of another
State, in violation of a statute which made it an offence to
send a claim against a debtor out of the State for collection,
in order to evade the exemption law.   See also *Zimmer-
man* v. *Franke*, 34 Kansas 650; *Sercomb* v. *Catlan*, 128
Illinois 556; *Erie R. R.* v. *Ramsey*, 45 New York, 637;

*Cole* v. *Cunningham*, 133 U. S. 107 ; *Lord Portarlington* v. *Soulby*, 3 Mylne & Keen, 104 ; *Bushby* v. *Munday*, 5 Madd. 297 ; *Story's Equity Jurisprudence*, secs. 899, 900.

In the case at bar, the equity is much stronger, we submit, than in any of the precedents cited. In those cases, the Courts of Equity have restrained the use of the tribunals of another jurisdiction for the purpose of evading or securing unfair priorities between creditors, on statutes giving exemptions of wages from attachment, or to prevent gambling debts, illegal by the law of the domicile of the parties, from being collected contrary to the policy of that law, in foreign jurisdictions. In all of them, the improper use of the foreign tribunal was to unjustly cause either money or property to be delivered up. Here, as we have seen, the attempt is to procure the arrest and imprisonment of the person of the appellee in order to coerce the payment of a pretended private debt, contrary to the express mandate of the Constitution of this State, which, as residents of this State, the appellants were in duty bound to obey and respect. If the Chancellor will not suffer a citizen of the State, in fraud of its laws and policy, to use the tribunals of another State to unjustly compel his fellow-citizens to deliver up, or pay, money, *a fortiori*, he will not permit him to so unlawfully use such tribunals to deprive such fellow-citizen of his liberty. The liberty of the citizen and the sacredness of his person from arrest in a civil suit, is of more importance in the eye of the law, than any mere pecuniary claim.

The transactions between the appellants and the appellee, having all taken place in Maryland, are of course to be decided by the law of Maryland. *Stewart* v. *Schall*, 65 Md. 308.

In the suits in New York, the Maryland law would have to be proved as a fact. This is so as matter of general law. (*Stewart* v. *Schall*, 65 Md. 306). In addition to this it is so alleged in the bill, and this allegation being as to the procedure in New York, and therefore being a matter of

foreign law, is to be taken as an allegation of fact. Being an allegation of fact, the averment in the bill must, of course, be taken as correct, and it must be taken as established that the Maryland law must be proved in New York as a matter of fact. *Lamm* v. *Burrell*, 69 Md. 272.

It takes no argument to show that with all possible respect for the New York Tribunals, the Maryland law is more apt to be correctly interpreted and administered by the Maryland Courts, where it is judicially known to the Court, and where the Courts are naturally more familiar with its rules and more imbued with its spirit, than by the New York Courts, where the law will be proved as a fact by the testimony of expert witnesses, possibly of limited information and of not unimpeachable impartiality. It is therefore certain, we submit, that more complete and exact justice can, and probably will, be done, in determining whether these transactions are void when tested by the law of Maryland, if the question is decided in this forum, than if decided in New York. This Court *knows* the laws of Maryland, and *knows* that by that law the transactions are undoubtedly void as gambling transactions, and this Court further *knows*, that if the case is decided in this forum, it will be held that these transactions were and are illegal and void. *Stewart* v. *Schall*, 65 Md. 289 ; *Burt* v. *Myer*, 71 Md. 504 ; *Billingslea* v. *Smith & Pride*, 77 Md. 504 ; *Couey* v. *Smith*, 82 Md. 586.

The injunction granted prevents the New York suit from going to judgment. The remedy, however, would be the same had no defence been interposed in those actions, and judgment had been entered therein without objection. This Court having decided that "equity will grant relief, against a judgment at law upon a bond given for a gambling consideration, though no such defence was made in the suit at law." *Emerson* v. *Townsend*, 73 Md. 226.

There can be no doubt that apart from the difficulty growing out of having to prove the law of Maryland as a fact in New York, it will be more difficult to properly produce the

evidence of the facts of the case in New York than it would to produce them here.   As all the transactions took place in Baltimore, it is no very violent presumption to assume that the clerks employed at Gittings' stock broker's office, and other witnesses necessary to prove the facts of the case are to be found in Baltimore.   Common experience tells us that the expense of taking and keeping witnesses in New York, even if they were willing to go, would be simply enormous.   If the witnesses should be for any reason unwilling to attend, there is no power to compel their attendance.   Whether their testimony could be taken under a commission depends upon the New York law of procedure, but if it should be, such testimony is obviously a poor substitute for the presence of the witnesses in open Court.

Again, it has been held that when the Courts can see that a suit brought in a foreign jurisdiction, by one citizen of the State against another citizen, is not brought honestly, but is a mere malevolent and black-mailing scheme instituted for the purpose of harassing the plaintiff, it will grant relief by injunction.   *Claflin* v. *Hamlin*, 62 How. Pract. 284.   In *Allen* v. *Buchanan*, 97 Alabama, 402, the Court, in granting an injunction on facts similar to those in *Keyser* v. *Rice*, 47 Md., adopts and quotes with approval the statement of Mr. High in his work on Injunction, section 106 : " While, therefore, the Court will assume no control over the course of the proceedings in the foreign tribunal, it may and will interfere to prevent those who are amenable to its own process from instituting or carrying on suits in other States *which will result in injury and fraud.*"   The *jurisdictional fact* to authorize a Court of Chancery to restrain one person within its jurisdiction from prosecuting a suit against another, is broadly stated in 2 *Beach on Modern Equity Jurisprudence*, section 649, to be " that such proceedings will be vexatious or oppressive, or are *instituted to obtain some unjust or inequitable advantage.*"   In *Rogers* v. *Rogers*, 37 West Virginia, 420, it is declared, approving *High on Injunctions*, " that equity will restrain by injunction not only

the suit at law itself, but also the introduction of evidence in such suit which, though perhaps legally admissible, is *manifestly contrary to right and justice."*

Now, let us apply these principles to this case. As we have already seen, the bill, after stating the gambling nature of the transactions, that they were void by the law of Maryland, and that the plaintiff had a right to have their validity tested in a Maryland tribunal, alleges, " and this plaintiff believes and therefore charges that the said Miller and Wilson *went out of the jurisdiction in which both they and this plaintiff resided and still reside, for the purpose of evading and escaping the Maryland law,* and of obtaining a judgment against the plaintiff in New York, when by the law of the place where all the transactions out of which the controversy arose (which place is the domicile of this plaintiff and of the said Miller and the said Wilson), they are not entitled to such judgment." Then, after alleging the obtention of the order of arrest from Judge McLean in New York, and that in the moving affidavits on which that order was based, Miller and Wilson swore that the ten Metropolitan bonds were wrongfully and without the knowledge or consent of said Miller and of the said Wilson, hypothecated. with the First National Bank, the bill charges that that statement of the appellants " was false ; was known to be false when sworn to by said Miller and said Wilson, and was made for the deliberate, malicious and unlawful purpose of enabling the said Miller and Wilson to have this plaintiff arrested suddenly when away from home, and of thus enabling said Miller and Wilson to dishonestly and oppressively coerce him *and his friends,* in order to secure the liberty of this plaintiff, into paying the said Miller and Wilson's unlawful and invalid claims against this plaintiff." If these allegations are true (and they must be taken for true in every particular on this appeal), can anyone doubt that the New York suits are vexatious and oppressive, and that they are instituted to obtain some unjust or inequitable advantage ? Will they not, if not checked by the strong

arm of this Court, " result in injury and fraud?" Are they not the worst form of blackmail, aggravated by the most willful and corrupt perjury?

For these reasons alone, if there were no others, and on account of the fraudulent conduct of these appellants, and the unworthy and unlawful purposes for which they brought their suits in New York, and to aid which they have abused the process of the New York Courts, the injunction was properly granted. In the petition in which the appellants, who had procured the arrest of the appellee when away from home, by filing a bond for $1,750, modestly ask the Court to increase the injunction bond in this case from $2,000 to $50,000, although the granting of the injunction, if it should be afterwards dissolved, could only have delayed during the time the injunction was in force, the trial of the suits in New York, and could put them to no other possible inconvenience, and if it should be made perpetual, could work them no harm except so far as having the case tried where the facts arose, and where the Court would judicially know the law, might thwart their designs, they seem to complain that the injunction not only restrained them from proceeding against Gittings, but also restained their proceedings against Allen. Such a course was eminently proper. It is a cardinal rule of equity juris. prudence that equity will do justice entirely and not by halves, and that when the jurisdiction of the Equity Court once attaches to a case, it will be maintained for the final adjudication of all the rights involved. *Phelps' Juridical Equity*, section 179, page 260. And if Allen had not been made a party to this suit, and if the Court, upon issuing the injunction, had not been able to assume complete juris: diction over the controversy and to decree complete justice between all the parties, there would have been a plausible ground for the appellants to insist that as the Court could not do complete justice in the matter, it should not interfere at all. And apart from this, restraining the suits in New York against Allen was necessary to grant complete

relief to Gittings. Gittings, for the reasons we have given, was entitled to be freed from *any* further vexation or molestation in the New York suits on account of these illegal gambling transactions. If the suits in New York were suffered to proceed against Allen, and judgment should be there rendered against him, then as they would be in form, suits against him for a partnership transaction, under the judgments, not only his personal property, but also the partnership property, could be taken in execution, and thus Gittings would be injured.

This Court said in *Johnston* v. *Matthews*, 32 Md. 368: "One of the partners having been summoned in the suit, which was instituted against all the parties, there was a party in Court, a judgment against whom would have been effective against the whole of the effects and assets of the firm." See also *Inbush* v. *Farwell*, 1 Black. 566; *Rhodes* v. *Amsinck*, 38 Md. 345.

And again, the suits in New York were both joint suits against Gittings and Allen as partners, and after both parties had been summoned and had appeared, it would not have been competent to have proceeded against one alone. 17 *Am. & Eng. Encyclopaedia of Law*, 1243; *Loney* v. *Bailey*, 43 Md. 10; *Kent* v. *Holliday*, 17 Md. 387. If the appellants had attempted to proceed against Allen alone, after both he and Gittings had appeared and answered, such action would have amounted to a discontinuance of the entire suit against both Allen and Gittings. *Tippett* v. *May*, 1 Bos. and Puller, 411.

But apart from all this, the case of *Bushby* v. *Munday*, 5 Madd, 309, already referred to, shows that if Allen had come here after he was sued, and had filed a bill against Gittings and Miller and Wilson, alleging that the transactions took place in Maryland, that they were gambling and void, and that, therefore, Allen had the right to submit himself to the Maryland jurisdiction and have the suits in New York enjoined, the injunction would have been granted. It will be difficult for the appellants to distinguish between

the right of a Scotchman, who, when sued on a void English gambling contract in Scotland, was not amenable to the process of English Courts to come into England after suit brought in Scotland, and secure an injunction against the suit at his domicile on the ground that more complete justice could be done in the English tribunal, and the right of a New Yorker who, when sued in New York on a void Maryland gambling contract, was not amenable to the process of the Maryland Court, to come into Maryland after suit brought in New York, and secure a similar injunction against the suit in *his* domicile, on the ground that more complete justice can be done in the Maryland tribunal. Except in names, it is submitted the two cases are identical.

Again, under Code, Article 16, section 161 (Equity Rule No. 33), the defendant Allen having appeared and submitted himself to the jurisdiction of this Court, the appellants in this proceeding can obtain a decree against him, their co-defendant, should it appear at the trial of this cause, that they have any *lawful demand* against him, growing out of the transactions above set forth.

BRYAN, J., delivered the opinion of the Court.

Ernest Gittings filed a bill in equity against Emanuel H. Miller and Arthur E. Wilson.

It was alleged that Gittings was a citizen and resident of the State of Maryland and of the city of Baltimore; that Miller and Wilson were also citizens and residents of the same city and State; that in the month of September, eighteen hundred and ninety-five, Gittings and Charles C. Allen, who is a resident and citizen of the State of New York, formed a partnership for the conduct of the stock brokerage business in the city of Baltimore under the name of Gittings & Co., and that in said business Gittings was the active member who alone saw the customers, and conducted the operations with them; that in the summer and early fall of eighteen hundred and ninety-six Miller and Wilson had a large number of transactions with Gittings and Com-

pany in relation to stocks; that said transactions were in
the form of purchases and sales of stock made by Gittings
& Co., for the account and risk of Miller and Wilson, but
were in reality gambling transactions, and that there was no
intention or belief·by any of the parties to the transactions
that the stocks should ever be actually delivered, but that
the sole purpose was that there should be an accounting
and settling as the stocks rose or fell in price; that all these
gambling transactions were entered into in the city of Bal-
timore; and all settlements were also to be made in the city
of Baltimore; that for the purpose of indemnifying Gittings
& Co. against loss in executing their orders Miller and Wil-
son placed in the hands of Gittings as margins ten bonds of
the par value of a thousand dollars, and two hundred shares
of the preferred stock of the Southern Railway Company;
that these bonds and shares of stock were delivered to Git-
tings with the express intention and expectation on the part
of Miller and Wilson that he would hypothecate them for
the purpose of obtaining money to enable him to aid Miller
and Wilson in their gambling transactions; that the amount
of money which would have been necessary to purchase the
stocks and carry them until Miller and Wilson should elect
to order the sale of them to make their settlements with
Gittings & Co. would have been over two hundred thou-
sand dollars, and Miller and Wilson both knew that neither
Gittings nor Gittings & Co. had any such sum; and Miller
and Wilson had no such sum with which to make payment
for the stocks, as it would be necessary for them to do, if it
had been intended that there should be an actual delivery
of them; that Gittings hypothecated the ten bonds in the
First National Bank of Baltimore for the sum of eight thou-
sand dollars, for which sum the account of Miller and Wil-
son was duly credited by him on the books of Gittings &
Co.; that this hypothecation was made with the full knowl-
edge at the time it was made of Wilson and of William H.
Miller, the father of Emanuel Miller; that at that time
Emanuel Miller was absent from Baltimore, and that on his

return a day or two afterwards he was informed of it by Gittings; that the Southern Railway stock was also hypothecated in accordance with the understanding and expectation of the parties when it was delivered to Gittings; that it was hypothecated with Cuthbert & Co., stock brokers in the city of New York, through whom Gittings acted in carrying on the greater part of the speculative transactions for Miller and Wilson.

The bill of complaint further alleges that on the tenth day of September, eighteen hundred and ninety-six, Gittings & Co. were unable to settle with Miller and Wilson for the winnings to which they would have been entitled if their dealings had not been illegal gambling transactions; and that Gittings would not have felt justified in making such a defence but for the perjuries and fraud, and the oppressive and dishonest conduct of said Miller and Wilson hereinafter set forth. It also alleges that on the said tenth day of September Gittings gave to Miller a check on the Continental National Bank for eight thousand dollars in part payment of said winnings, and that at the time the check was given Miller knew that there were no funds to meet it, and that it would not and could not be good, unless Allen, the partner of Gittings, should provide for its payment, which he did not do; that Miller and Wilson brought two actions in the city of New York against Gittings and the said Allen, claiming in one of them about eight thousand dollars for non-payment of the check, and in the other seventeen thousand dollars, for the alleged conversion of the bonds and stock deposited as margin, and for the alleged conversion of the different stocks on whose fluctuations in price Miller and Wilson had been gambling; that Gittings was summoned to appear to these actions when he was in New York. (This was at the time hereinafter mentioned when he was arrested and held to bail); that Gittings has filed his answers to these actions, and copies of the answers are filed with the bill of complaint; that the complainant believes that Allen has also filed answers, but that complainant is not possessed of

copies of them, and cannot therefore file them; that he believes and therefore avers that by the law and practice of the State of New York the complaints and answers in actions are kept in the offices of the attorneys of the several parties until the cause is ready for trial; and that the complainant believes and therefore avers that Allen's answer is not filed in any public office from which a duly certified copy could be obtained. The bill of complaint further alleges that the right of Miller and Wilson to recover in these actions depends on the question whether the aforesaid transactions are wagering or gambling transactions, and that their validity depends on the law of Maryland; that the complainant has a right to have their legality decided by the law of Maryland; that if these causes are tried in New York it will be necessary to aver and prove the Maryland law as a fact, while if they are tried in Maryland the law of the State will be judicially recognized, and more equal and complete justice can be done; that the complainant submits his rights to the jurisdiction of the Court, and is willing that such decree may be passed as is just between himself and Miller and Wilson; that the said Miller and Wilson went out of the jurisdiction in which both they and the complainant resided, for the purpose of evading and escaping the Maryland law and of obtaining a judgment in New York, to which they are not entitled by the law of the place where the transactions arose and where the parties are domiciled. The bill of complaint further alleges that they obtained an order for the arrest of the complainant from a Justice of the Supreme Court of New York in the second of the above mentioned suits upon certain affidavits made by them and others, which state, among other things, that the complainant wrongfully, and without the knowledge and consent of Miller and Wilson, hypothecated the before-mentioned bonds; that the said statement was false, and was known to be false by Miller and Wilson, and was made for the deliberate, malicious and unlawful purpose of enabling them to have the complainant arrested suddenly when away

from home, and dishonestly and oppressively coercing him and his friends to pay their unlawful and fraudulent claims in order to secure complainant's liberty; that the complainant was arrested when in the city of New York and held to bail in the city of New York in the sum of fifteen thousand dollars; that the complainant moved by his attorney to vacate the order of arrest, but the Court overruled the motion without filing an opinion; that the said Allen has stated through his attorneys that he will voluntarily appear in this suit, if made a party defendant. The prayer of the bill of complaint was for an injunction prohibiting the further prosecution of the suits in New York, and from any further proceedings looking to the arrest or imprisonment of the complainant in said suits; and that the Court would assume jurisdiction, and for general relief. Process was prayed against Miller and Wilson and against Allen. The Court granted the injunction. Miller and Wilson having filed an answer appealed. It is stated in the appellee's brief that Allen has appeared as a defendant and submitted himself to the jurisdiction of the Court. He was represented by counsel at the argument in this Court.

It appears by the exhibits filed with the bill of complaint that the suits were brought in the city of New York abouf the sixteenth of September, eighteen hundred and ninety-six, and that the order for the arrest of Gittings was issued on the twenty-seventh day of October. He was arrested on the same day and gave bail, by which he and his surety became bound that he should at all times render himself amenable to any mandate which might be issued to enforce a final judgment against him in the action. After his release on bail, that is, on the fourth of December, he filed his answers to the two suits against him and his partner Allen. The plaintiffs in the suits in anticipation of Gittings' visit to New York prepared their own affidavits in the city of Baltimore on the seventeenth of October, and obtained about the same time the affidavits of other persons in the same city. The plaintiff Wilson made an additional affidavit in

New York City on the twenty-seventh of October. The bail given by Gittings required him to obey any mandate which might be made to enforce a final judgment in the action, and made it, therefore, necessary for the protection of his rights that he should answer and resist the complaint filed in the suit. It is not a question in this case whether it was lawful for the plaintiffs in the New York suits to cause Gittings to be arrested. The declaration of the Constitution is unconditional and absolute : " No person shall be imprisoned for debt." The payment of debts is to be obtained from the property of the debtor; his body cannot be taken in satisfaction of it. Neither can it be seized and held in restraint as a means of coercing or inducing him to make payment. An attempt made in this State by a creditor to do so would subject him to serious consequences. It is presumed that no one would contend that the citizens and residents of the State are not bound to yield obedience to the supreme law of the land.

The important inquiry concerns the powers of a Court of Equity to interfere and protect the citizens of the State in their constitutional rights, when the processes of legal tribunals are inadequate to the purpose. An examination of authorities of high character will assist us in the decision of this question. In *Keyser* v. *Rice*, 47 Md. 203, it appeared that Keyser and Rice were both residents and citizens of the State of Maryland, and that Keyser was an employee of the Baltimore and Ohio Railroad Company at Cumberland, and that the Railroad Company was indebted to him for wages in an amount less than a hundred dollars, and that Rice had caused an attachment to be issued in the State of West Virginia, and laid in the hands of the Railroad Company for the purpose of condemning the debt due to Keyser in payment of a debt due by him to Rice. The debt to Rice accrued subsequently to the passage of the Act of 1874, chapter 45. This Act exempted from attachment the wages or hire due to any laborer or employee by any employer or corporation to the amount of

a hundred dollars.    This Court decided that Rice should be prohibited by injunction from prosecuting his suit for the condemnation of the wages due to Keyser.    In its opinion it stated very explicitly certain principles applicable to cases of the kind.    We will quote some of them :  " As long as a citizen belongs to a State, he owes it obedience, and as between States, that State in which he is domiciled has jurisdiction over his person and his personal relations to other citizens of the State."    " The power of the State to compel its citizens to respect its laws, even beyond its own territorial limits, is supported, we think, by a great preponderance of precedent and authority."    It also said that the jurisdiction to prevent by injunction suits in other States was not founded " upon any right to interfere with or control the proceedings of other tribunals in other States, but on the clear authority vested in Courts of Equity over persons within their jurisdiction and amenable to process to restrain them from doing acts which will work wrong and injury to others, and are contrary to equity and good conscience."    It also strongly condemned the effort by a creditor to evade the laws of his own country by a resort to a tribunal of another State for the purpose of obtaining a preference to the injury of other creditors and said that it was against equity to do so.    And it also said at the conclusion of the opinion:  " We think the intention to evade is necessarily presumed, when the act is persisted in after knowledge, and still inchoate, against the protestation of the complainant and the process of the Court."    Many high authorities were cited by the Court in support of their opinion.    We may say that the decision in *Keyser* v. *Rice* has been quoted with approval in Courts of the highest repute.

In *Cole* v. *Cunningham*, 133 U. S. 107, this question was considered very fully and elaborately.    *Keyser* v. *Rice* was quoted and many of the cases which this Court had cited in its opinion.    The learned Court also quoted with approval *Dinsmore* v. *Neresheimer*, 32 Hun. 204, "Where the Supreme Court of New York held that an express company could maintain an action in New York to restrain the defendant,

a resident of the State of New York, from prosecuting actions against the company in the District of Columbia, brought to avoid a decision of the Court of Appeals of New York, differing from the rule upon the same subject in the District of Columbia." And it also said, adopting the words of another Court, "that in the Courts of a State any citizen of that State may be enjoined from resorting to the Courts of any other State for the purpose of evading the exemption laws of his own State." The facts in *Cole* v. *Cunningham* were as follows: Two citizens of Massachusetts, who were partners, becoming aware of the insolvent condition of another citizen of the same State, assigned their claim against him without consideration to one Fayerweather, a resident of New York, and caused funds of their debtor in New York to be attached in Fayerweather's name but for their own benefit; while these attachments were pending the debtor in Massachusetts was adjudicated an insolvent. The Supreme Court of Massachusetts, at the suit of the assignee in insolvency, decided that the Massachusetts creditors should be restrained by injunction from prosecuting the attachment in New York in the name of Fayerweather, saying: "As residents of this State, they cannot be allowed to this extent to defeat the operation of the assignment, and thus to obtain a preference over other creditors resident here. They are within the limits of the jurisdiction of this Court, and amenable to its process and should be enjoined from prosecuting a suit the effect of which, if successful, will be to work a wrong and injury to other residents of the State." This decision was affirmed by the Supreme Court of the United States. The principle involved is sustained by a vast weight of authority, as may be readily seen by an examination of the opinion of the learned Court.

There are other cases which we think it proper to mention. In *Talleyrand* v. *Boulanger*, 3 Vesey, 447, two complainants filed a bill in equity against the defendant for an injunction. It appeared that all the parties were Frenchmen sojourning in England, and that one of the complain-

ants while in France had become indebted to the defendant,
and that by the law of France there could not be an arrest
of the person in a suit on the obligation which had been
given for the debt.    The complainants and defendant fled
from France and came to England during the Revolution.
The debtor was arrested in England at the suit of his cred-
itor, and to procure his release he paid some cash, and
gave bills of exchange, and a bond, to all of which the other
complainant in the equity suit became a surety.    After the
first bill of exchange had been paid, the complainants re-
fused to make any more payments, whereupon they were
arrested in four actions and held to bail at the suit of the
defendant in the equity suit.    An injunction was granted
against proceeding with the suits and it was continued by
the LORD CHANCELLOR.    He said that the proceeding on
the part of the defendant had been extremely oppressive
and immoral ; and that if the case stood on the original con-
tract " it would be contrary to all the principles which guide
the Courts of one country in deciding on contracts made in
another, to give a greater effect to the contract, than it
would have by the laws of the country where it took place."
He also said : " I cannot suffer these bills of exchange so
obtained to have effect."    " I cannot suffer these actions to
proceed."    This case is remarkable from the circumstance
that the Court extended to domiciled aliens, in respect to
the contracts made in their own country, the protection due
to its own fellow-subjects under similar circumstances.    It
has been made the subject of adverse criticism and disap-
proval in *Liverpool Marine Credit Company* v. *Hunter,* Law
Reports, 3 Chancery Appeals, 486.    Nevertheless it was
pointedly approved by the House of Lords in *Don* v. *Lipp-
mann,* 5 Clark and Finnelly, 18 ; LORD BROUGHAM deliver-
ing the opinion.    In the same opinion, *Melan* v. *Fitzjames,*
1 Bosanquet & Puller, 138, was approved on the same point.
It is unnecessary in this case to determine the question in
respect to aliens, as we have before us only citizens and resi-
dents of our own State claiming the protection of its laws.

The Liverpool Company case is thus stated : " A British ship, mortgaged in England by a British subject to British subjects, was arrested at New Orleans by creditors of the mortgagor, also British subjects resident in England, and as the Courts of New Orleans do not recognize such mortgages of ships, the mortgagees, in order to protect the ship from sale, gave bonds for the amounts claimed by the creditors. The mortgagees afterwards filed a bill to restrain the creditors from suing on these bonds : *Held*, that though the decisions of the Courts of New Orleans might be open to the reproach of injustice, yet as the creditors owed no duty to the mortgagees, and had a right to proceed against the property of their debtor wherever they found it, the bill could not be maintained." Whatever credit may be due to this decision it is proper to say that it is in direct conflict with *Simpson* v. *Fogo*, in the High Court of Chancery, 1 Heming & Miller, 195. The principle, however, on which it is decided can have no bearing on the questions in the present case. It is stated that the creditors who proceeded against the ship owed no duty to the mortgagees.

In *Bushby* v. *Munday*, 5 Maddock, 297 ; and in *Portarlington* v. *Soulby*, 3 Mylne & Keen, 104, gambling debts were contracted in England, and the defendants were enjoined from prosecuting suits on them in Scotland and Ireland respectively. In *Bushby's case*, the Court said that the English Court was a more convenient jurisdiction than the Scotch Court for determining the question between the parties, which depended on the law of England. And also said : " The substantial ends of justice would require that this Court should pursue its own better means of determining both the law and the fact of the case, and it must necessarily follow that it must bind the interests of the parties by its own conclusions." In *Claflin* v. *Hamlin*, 62 Howard's Practice Reports (N. Y.), it was alleged that a suit in Illinois brought by a citizen of New York against other citizens of the same State was instituted for blackmailing purposes, and upon causes of action obtained by fraud. It was held

that it should be enjoined ; the Court saying that it was not brought in good faith, but for the purpose of vexing, annoying and harrassing the parties sued.

The authorities shew that equity will enjoin suits in other States where there is fraud, oppression, vexation, injustice or unconscientious advantage ; and most especially where there is an attempt to evade or defeat the operation of the laws of the State where both parties to the suit reside. The transactions in this case all occurred in the city of Baltimore ; the parties to this controversy are all citizens and residents of that city ; the evidence would naturally be there and readily obtainable ; and Courts are established there with jurisdiction competent to determine the rights of the parties, according to the law of Maryland of which they have judicial knowledge. The complainant is subjected to prosecution before a tribunal in another State which must ascertain the law through imperfect methods of proof; where there must be much difficulty and expense in obtaining the evidence of the witnesses ; and where the legal processes have features of severity and harshness from which citizens of Maryland are protected by the Constitution of the State. Ever since the adoption of the Constitution of 1851, arrest of the person has been forbidden in the prosecution of civil actions. The *capias* both as mesne and final process has been unknown. Collection of a debt cannot be coerced either by imprisonment or threat of imprisonment. In the present case the complainant was arrested, and presented with the alternative of going to prison, or giving bail, which bound him at all times to " render himself amenable to any mandate which may be issued to enforce a final judgment against him in the action. It is believed that no one would seriously contend that such a proceeding would be lawful in Maryland. When this cause of action arose Miller and Wilson well knew that by the Constitution Gittings was protected from any such invasion of his liberty as a mode of enforcing the payment of what was alleged to be due from him. And yet they de-

liberately violated his constitutionally guaranteed right of personal liberty. A Court of Law has not adequate power to relieve him from this imposition. If redress is to be afforded, it must come from a Court of Equity. This Court has solemnly decided that a statute for the protection of the property of a citizen of the State shall not be violated by another citizen through the instrumentality of a suit in another State. When the statute says that the citizen's property shall be unmolested, no other citizen shall disobey the laws even beyond the bounds of the State. But here the sacred right of personal liberty is violated in contempt and defiance of the Constitution. The person of a citizen is seized as a portion of the proceeding for litigating a civil liability. The complainant below has every title to relief which has been established in the adjudicated cases. All the transactions arise from and are parts of gambling contracts made between citizens of this State. In *Bushby* v. *Munday*, 5 Maddock, 297, a contract of this kind was made in England, and the Court of Chancery prohibited the prosecution of a suit on it in Scotland, although the complainant was a resident of Scotland, and had real estate there. A gambling contract was void in Scotland as well as in England; but as the Court had better means of determining both the law and the facts of the case than the Scotch Court, it thought that justice required that it ought to try the case and enjoin the suit in Scotland. In *Portarlington* v. *Soulby*, 3 Mylne & Keen, 104, LORD BROUGHAM enjoined a suit in Ireland on a gambling contract in England. It is not questioned that by the law of New York Miller and Wilson could sue Gittings in the State of New York. The question in the cases where equity has intervened has not been whether the plaintiffs at law had a right to sue at law; but whether there were not equitable circumstances which ought to prevent the exercise of such a legal right. If they had no right to sue according to the course of the local law there would have been no necessity for equitable relief. The suit here is not only brought on a contract

made in a gambling transaction, but, although the bonds
and stock were delivered to Gittings with the express inten-
tion and expectation that he should hypothecate them, it is
alleged that he had wrongfully hypothecated them without
the knowledge and consent of Miller and Wilson, and on
this allegation an order has been obtained for Gittings'
arrest.

In the long line of cases on this subject, beginning at
LORD HARDWICKE's decision in *McIntosh* v. *Ogilvie*, 4 T.
R. 193, and coming down to the present time, it has been
uniformly held that a suitor shall not by impleading a fel-
low citizen or fellow subject in the Court of a foreign
country, deprive him of a right or benefit given to him by
the laws of their own country.   When they owe a duty to
each other, this duty must be observed both abroad and at
home.   And on this footing Courts of Equity exert their
jurisdiction to give the relief which cannot be obtained in
a Court of Law.   The further prosecution of the suits in
New York ought to be enjoined and the controversy ought
to be determined by the Court granting the injunction,
which has power to do full and complete justice between
the parties.   If the suits should be continued against Allen
alone, and result in a judgment against him, it could be
enforced against the partnership property, and would thus
affect the interest of Gittings in the partnership effects as
fully as if the judgment had been rendered against him.
*Johnson* v. *Matthews*, 32 Md. 368; *Folsom* v. *Fertilizer Co.*,
October Term, 1896, *ante*, p. 52.

The fact that Allen is a resident of New York might dis-
tinguish this case from those relied on to sustain the right
of a Court of Equity to interfere under ordinary circum-
stances, but the appeal admits for the purpose of this case
the allegation in the bill, "that the said Miller and Wilson
went out of the jurisdiction in which both they and this
plaintiff resided and still reside, for the purpose of evading
and escaping the Maryland law and of obtaining a judg-
ment against the plaintiff in New York," and that the

statement upon which the plaintiff was arrested " was known to be false when sworn to by said Miller and Wilson, and was made for the deliberate, malicious and unlawful purpose of enabling the said Miller and Wilson to have the plaintiff arrested suddenly when away from home, and of thus enabling said Miller and Wilson to dishonestly and oppressively coerce him and his friends, in order to secure the liberty of the plaintiff into paying the said Miller and Wilson's unlawful and invalid claims against this plaintiff." If it be true as the appeal admits, that the proceedings were instituted in New York for those purposes, and not because Allen resided there, his residence is immaterial. On this appeal we are obliged to assume that all the allegations of the bill of complaint are true.

We have considered the questions before us exclusively upon the allegations of the bill of complaint, as it was our duty to do. We have given considerable prominence to the arrest of the complainant, but we think that we have mentioned other circumstances, which show that the bringing of the suits in New York was oppressive and unreasonable; that it tended to embarrass and defeat justice in the settlement of the controversy between the parties; that it was an unconscientious and inequitable attempt to obtain an advantage over the parties who were sued.

*Order affirmed with costs and cause remanded.*

(Decided April 8th, 1897).

FOWLER, J., dissents.